IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| MORRIS CORPORATION (AUST) PTY LTD, an Australian corporation, | CV. 04-708-PK |
| | FINDINGS AND |
| Plaintiff, | RECOMMENDATION |
| v. | |
| THE EVENT SOURCE, a Utah Corporation, | |
| Defendant. | |

PAPAK, Magistrate Judge:

Plaintiff Morris Corporation (Aust) Pty Ltd ("Morris") filed this action alleging breach of

contract.  Defendant The Event Source ("TES") filed affirmative defenses and counterclaims

alleging breach of contract, negligence, intentional interference with contract, and restitution.

Page 1 - FINDINGS AND RECOMMENDATION

Before the court is TES's Motion for Partial Summary Judgment, Morris's Motion for Partial

Summary Judgment and TES's Motion to Strike paragraph ten of the McVicker Declaration.[1]

For the reasons that follow, TES's Motion for Partial Summary Judgment (No. 42) should

be granted in part and denied in part, Morris's Motion for Partial Summary Judgment (No. 47)

should be granted in part and denied in part, and TES's Motion to Strike paragraph ten of the

McVicker Declaration (No. 71) should be denied as moot.

LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure allows the granting of summary

judgment:

> if the pleadings, depositions, answers to interrogatories, and
> admissions on file, together with the affidavits, if any, show that
> there is no genuine issue as to any material fact and that the
> moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c).  When considering a motion for summary judgment, the district court's role

is not to weigh the evidence, but merely to determine whether there is a genuine issue for trial.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Freeman v. Arpaio, 125 F.3d 732,

735 (9th Cir. 1997).

A party seeking summary judgment always bears the initial responsibility of informing

the district court of the basis for its motion, and identifying those portions of the record which it

believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett,

477 U.S. 317, 323 (1986).  Only after the moving party has made such a showing does the

burden

---

[1]TES actually moves to strike paragraph five of the McVicker Declaration.  However, the testimony TES moves to strike is set forth in paragraph ten.

Page 2 - FINDINGS AND RECOMMENDATION

shift to the opposing party to show that a genuine issue of fact remains.  See Fed. R. Civ. P.

56(e).

To establish the existence of a genuine issue of material fact, the non-moving party must

make an adequate showing as to each element of the claim on which the non-moving party will

bear the burden of proof at trial.  See Celotex Corp., 477 U.S. at 322-23; see also Taylor v. List,

880 F.2d 1040, 1045 (9th Cir. 1989); Harper, 877 F.2d at 731.  The opposing party may not rest

on conclusory allegations or mere assertions, see Taylor, 880 F.2d at 1045; Leer v. Murphy, 844

F.2d 628, 631 (9th Cir. 1988), but must come forward with significant probative evidence, see

Anderson, 477 U.S. at 249-50; Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989).  The evidence

set forth by the non-moving party must be sufficient, taking the record as a whole, to allow a

rational jury to find for the non-moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574, 587 (1986); Taylor, 880 F.2d at 1045.  Where "the factual context renders

[the non-moving party's] claim implausible . . ., [that party] must come forward with more

persuasive evidence to support his claim than would otherwise be necessary" to show that there

is a genuine issue for trial.  Matsushita Elec. Indus. Co., 475 U.S. at 587; see also Harper, 877

F.2d at 731.

### FACTUAL BACKGROUND

TES is a logistics and event-planning coordinator.  Beginning in the summer of 2003,

TES was subcontracted by Kellog, Brown & Root ("KBR"), the overall logistics contractor for

the U.S. Military in Iraq, to operate six dining facilities ("DFACs") in Iraq.

In August 2003, SelRico Services, Inc. ("SelRico") was operating as a second-tier

subcontractor for TES, performing the catering work at a TES-managed dining facility for

coalition troops at the Baghdad International Airport ("BIAP") in Iraq.  In late August, TES gave

Page 3 - FINDINGS AND RECOMMENDATION

SelRico notice of default with five days to cure.  At the recommendation of KBR, TES contacted

Morris, a company engaged primarily in remote-site catering, as a potential replacement for

SelRico.  On August 26, 2003, Morris and TES signed a letter of intent ("LOI") for Morris to

replace SelRico.  The LOI included a duty of loyalty from Morris to TES.

Morris was scheduled to take over for SelRico on August 30, 2003.  TES asked Morris to

arrive at the BIAP DFAC after the midnight meal that ended at 1:00 am on August 30 because

TES did not want SelRico to know that it was being replaced until that time.  However, a

busload of Morris personnel actually arrived at BIAP a day early.  SelRico continued to serve

until after breakfast the following day, and then was terminated by TES for convenience.  Morris

was able to prepare the next meal without any interruption in service.  TES alleges that as a

result of the early arrival TES had to terminate SelRico for convenience rather than cause, a

difference which resulted in financial repercussions for TES.

At the time Morris began working at BIAP, Morris and TES had not entered into a formal

contract.  Morris and TES negotiated the terms of Morris's BIAP engagement, and the terms of

their agreement were first set forth in a "BIAP Term Sheet," which was finalized on October 28,

2003.  On that same date, Morris and TES entered into a master subcontract ("Master

Subcontract").

Shortly thereafter, the quality of Morris's service began to deteriorate.  Because of the

need for a quick transition to avoid disruption in service to the troops, TES chose to terminate

Morris for convenience rather than cause.  On November 18, 2003, Morris and TES entered into

a termination agreement ("Termination Agreement").  Pursuant to the Termination Agreement,

TES assumed Morris's catering responsibilities at BIAP.  TES then continued to operate BIAP

until July 2004, when the facility was closed by the military.

Page 4 - FINDINGS AND RECOMMENDATION

This lawsuit arises out of TES's alleged breach of the Termination Agreement and Morris's alleged breach of the Master Subcontract and tortious conduct. Morris's Amended Complaint alleges a single breach of contract claim. TES's Answer includes nine affirmative defenses and four counterclaims. Morris's Answer to TES's counterclaims sets forth seven affirmative defenses.[2] The parties now move for summary judgment on some of those claims, counterclaims and affirmative defenses as discussed below.

## ANALYSIS

I.      TES's alleged breach of the Termination Agreement

The parties have each moved for summary judgment on Morris's claim for breach of the Termination Agreement and TES's affirmative defenses and counterclaims relating to the alleged breach.

A.      Amount owed by TES for food and equipment

Under its breach of contract claim, Morris seeks to recover the value of the food and equipment remaining onsite at BIAP after Morris's termination. TES does not dispute its obligation to pay Morris for food and equipment, but does dispute the amount due. Specifically, TES has raised an affirmative defense of setoff in the amount of $316,201 and $657,134, representing the Selrico-purchased inventory on hand or in transit when Morris arrived at BIAP.[3] Both parties move the court for summary judgment on Morris's claim for breach and TES's

---

[2]Some of these claims and defenses raise the same issue. For example, TES's fourth affirmative defense (failure of condition precedent), seventh affirmative defense (setoff) and fourth counterclaim (restitution) all arise from one provision of the Termination Agreement that allegedly allows TES to pay Morris only if TES receives payment from KBR.

[3]The parties agree that when Morris began working at BIAP, it used the existing food inventory left by SelRico, including some food that was in transit at the time SelRico was terminated and arrived at BIAP shortly thereafter.

affirmative defense of setoff.

Under the Termination Agreement, TES agreed to pay Morris "fair market value at actual

cost plus 10% for all Morris-owned property remaining onsite," and Morris's costs for all

remaining Morris-purchased inventory as of November 19, 2003.  (Termination Agreement,

§§2(h) and (I).)  The parties agree that the value of food and equipment inventory onsite at the

time Morris was terminated was $2,594,102.  The parties further agree that TES is entitled to a

setoff in the amount of $404,500, representing a payment already made by TES to Morris.  The

issue before the court, then, is whether Morris is entitled to the full $2,189,602, representing the

agreed upon $2,594,102 value of onsite food and inventory at the time of Morris's termination

minus the $404,500 already paid by TES, or whether TES should be allowed additional setoffs

representing the SelRico-purchased inventory.

Under Oregon law[4], courts follow three steps in interpreting contracts.  Yogman v.

Parrott, 325 Or. 358, 361 (1997).  First, the court must examine the text of contract and

determine whether the disputed provision is ambiguous.  Id.  Contract terms are ambiguous when

they reasonably can be given more than one meaning.  Id. at 363-64.  "Whether terms of a

contract are ambiguous is a question of law." Eagle Industries, Inc. v. Thompson, 321 Or. 398,

405 (1995) (citation omitted).  If the provision is unambiguous, the analysis ends and the court

construes the words of a contract as a matter of law.  Eagle Industries, Inc., 321 Or. at 405.  If

the provision is ambiguous, the court must proceed to the second step and examine extrinsic

evidence of the contracting parties' intent.  Yogman, 325 Or. at 363.  Finally, if examination of

extrinsic evidence of the parties' intent does not resolve the ambiguity, the court proceeds to the

---

[4]The Termination Agreement states that it is to be construed under Oregon law.
(Termination Agreement §7.)

Page 6 - FINDINGS AND RECOMMENDATION

third step and considers appropriate maxims of construction.  <u>Yogman</u>, 325 Or. at 364.

In support of its argument for setoff, TES relies on §§3 and 4 of the BIAP Term Sheet and §§2(d) and (I) of the Termination Agreement.  The court finds that the relevant contract provisions are unambiguous and do not allow TES to backcharge for SelRico-purchased inventory.

The Termination Agreement is the only operative agreement between the parties.  Section 6 of the Termination Agreement states, "[t]his Agreement constitutes the entire agreement between the parties and supercedes all prior written and/or oral agreements at any contractual level or tier that governs or may govern the relationship between the parties."  The word "supercedes" is not ambiguous and, in the context of Section 6, means that the Termination Agreement replaces all prior agreements between TES and Morris.  <u>See</u> <u>Eagle Industries, Inc. v. Thompson</u> 321 Or. 398, 406 (1995).  The practical result of § 6 is that TES cannot rely on "express backcharge" in BIAP Term Sheet because the BIAP Term Sheet is no longer in effect.

Under § 2(d), upon execution of the Termination Agreement, TES assumed Morris's responsibility under the Master Subcontract.  Section 2(d) then allows TES to backcharge Morris for "normal DFAC operating expenses," which is defined in that sentence to include "all food delivered to the DFAC for which Morris is liable through and inclusive of November 30, 2003."  TES argues that this includes Selrico-purchased inventory which was either onsite or in transit when Morris began working at BIAP.  The court disagrees.  Section 2(d) is forward looking, and the phrase "all food delivered to the DFAC for which Morris is liable through and inclusive of November 30, 2006" means from the date that TES assumes Morris's responsibilities under the Master Subcontract through and inclusive of November 30.  It does not allow TES to backcharge Morris for the Selrico-purchased inventory.

Page 7 - FINDINGS AND RECOMMENDATION

TES also argues that §2 (I) support's its interpretation because § 2(I) obligates TES to reimburse Morris for "Morris-purchased inventory" measured as of November 19, 2003.  TES argues that the use of the term "Morris-purchased inventory" in that section was used to distinguish between inventory purchased by Morris and inventory purchased by SelRico.  Again, the court disagrees.  Read in the context of the entire Termination Agreement, it is clear that TES was allowed to backcharge Morris only for inventory delivered to DFAC during the time TES was assuming Morris's responsibilities, for which Morris had not already paid.

Based on the clear language of the Termination Agreement, Morris should be granted summary judgment on its claim for breach of contract by TES for failure to pay for food and equipment, and awarded damages in the amount of $2,189,602, representing the agreed upon $2,594,102 value of onsite food and inventory at the time of Morris's termination minus a setoff in the amount of $404,500.  Morris should also be granted summary judgment on TES's claim for  a setoff for amounts representing inventory that was on site or in transit when Morris took over for SelRico.

B.      Missed meals and VIP functions

Morris alleges that TES breached the Termination Agreement by failing to pay Morris amounts due for adjustments to head counts ("missed meal payments") and VIP functions.  TES moves for summary judgment on that claim.

Section 3 of the Termination Agreement provides that "TES will pay Morris in the ordinary course per the Master Subcontract as it receives payment from KBR for September, October and through and inclusive of November 30, 2003, subject to the offsets in this agreement."  Under the Master Subcontract, Morris was required to provide documentation supporting each request for payment:

Page 8 - FINDINGS AND RECOMMENDATION

> PRICE AND PAYMENT: * * * Payment will be made in accordance with the terms of the [KBR] Agreement and this Master Subcontract and may, at TES's option, be conditioned upon receipt of lien and claim releases from [Morris]. * * * The time for payment of invoices, or for accepting any discounts offered, shall run only from the date correct invoices are received by TES. IT IS AN EXPRESS CONDITION OF ANY PAYMENT OBLIGATION OF TES TO [MORRIS] THAT TES MUST FIRST HAVE RECEIVED PAYMENT FROM [KBR] OR THE SUPPLIER WITH WHOM TES HAS CONTRACTED ON A PROJECT, IF TES'S ORDER REFERS TO ANY SPECIFIC PROJECT. IF FOR ANY REASON TES DOES NOT RECEIVE PAYMENT, NO PAYMENT SHALL BE DUE, OWING OR PAID TO [MORRIS].

(Master Subcontract, § 12.)

TES argues that Morris cannot recover amounts allegedly due for missed meal payments or VIP functions because Morris did not provide documentation as required under the Master Subcontract. Because Morris never provided documentation, TES argues, TES was unable to provide documentation to KBR, and never received payment for the alleged events. Under the "paid if paid" clause of §12, therefore, TES was not obligated to pay Morris for the missed meals or VIP functions.

Morris argues that TES did get paid and therefore has an obligation to pay Morris. Morris claims that documentation from Morris was never necessary for TES to get paid; TES's contract with KBR provided for a floor payment of 7001 troops per day, which far exceeded the payment due Morris for the missed meals.

In response, TES argues that the paid if paid clause in the Master subcontract tied Morris's right to payment to specific invoices, not whether TES received the contracted for floor payment.

Based on the evidence before the court, it is not clear whether the paid if paid clause

Page 9 - FINDINGS AND RECOMMENDATION

would allow TES to withhold payment for Morris's claimed missed meals and VIP functions when TES received payment for 7001 troops per day.  The court finds that there is a material question of fact as to the parties' intent in drafting the paid if paid clause.  Accordingly, summary judgment on this claim is not appropriate and should be denied.

   C.  Recapture

   TES alleges a counterclaim for restitution and an affirmative defense of setoff seeking to "recapture" a percentage of the amount due and owing Morris under the Termination Agreement. (Answer, Affirmative Defenses and Counterclaims at ¶¶ 13(a), 44-45.)  Both parties have moved for summary judgment on TES's counterclaim and affirmative defense.

   TES bases its counterclaim and affirmative defense on the fact that KBR withheld 1.4% of payment due TES, and argues that the paid if paid clause of the Master Subcontract, § 12, allows TES to withhold 1.4% from payment due Morris.   As stated above, the court finds that there is a material question of fact as to the parties' intent in drafting the paid if paid clause. Summary judgment on TES's affirmative defense of setoff and counterclaim for restitution should therefore be denied.

D.      Undisputed setoffs

TES alleges affirmative defenses seeking setoffs for the following amounts:  $280,846

(paid by TES to Morris's former employees); $109,187 (paid by TES to Toifor Services); $9,000

(paid by TES to Iraq Truck Rental); and $2,700 (paid by TES to Army Air Force Exchange

Services for sodas).  (Answer, Affirmative Defenses and Counterclaims at ¶ 13(h).)  TES moves

for summary judgment on these affirmative defenses.

Morris agrees that TES is entitled to the above setoffs.  Accordingly, TES's motion for

summary judgment should be granted and TES should be entitled to a setoff in the amount of

$401,737 from any amount awarded to Morris for breach of the Termination Agreement by TES.

E.      Accrued vacation pay

TES alleges as an affirmative defense to Morris's claim for breach of contract a setoff for

$50,631, representing the amount TES paid to former Morris employees for accrued vacation.

(Answer, Affirmative Defenses and Counterclaims at ¶13(f).)  Morris has moved for summary

judgment on this affirmative defense.

The parties agree that Morris did not provide for paid leave in its original contract with

its employees.  TES claims, however, that Robert McVicker, president of Morris, later orally

modified the employment contracts to include paid leave.  As a result, TES argues, TES was

obligated to pay Morris's former employees for accrued vacation when TES assumed Morris's

responsibilities as part of the Termination Agreement.

In order to survive summary judgment, TES must come forth with admissible evidence to

support its claim that McVicker orally modified the relevant employment contracts, thereby

creating a genuine issue of material fact.  The only evidence TES was able to produce were out

of court statements by former Morris employees and an affidavit from a TES employee repeating

Page 11 - FINDINGS AND RECOMMENDATION

statements made by former Morris employees.  Morris objected to this evidence on the grounds

that it was hearsay, and the court agreed.

Because the parties agree that Morris did not provide for paid leave in its original

contract with its employees, and TES is unable to show that there is no material question of fact

that McVickers orally modified the employment contracts, summary judgment in Morris's favor

is appropriate.

II.      Morris's alleged breach of the Master Subcontract

TES's First Counterclaim alleges that Morris breached the Master Subcontract in the

following ways:

> (a) by failing to adequately document work services and food
> purchases sufficient for TES to obtain payment from KBR;
> (b) by fraudulently inflating headcounts;
> ©) by arriving at the BIAP facility early, requiring TES to
> terminate SelRico for convenience rather than for cause; and
> (d) by breaching its contractual duty of loyalty in attempting to
> circumvent TES and deal directly with KBR.

(Answer, Affirmative Defenses and Counterclaims at ¶ 34.)  TES has also alleged a

corresponding affirmative defense for setoff.  (Answer, Affirmative Defenses and Counterclaims

at ¶ 13(a).) Morris has moved for summary judgment on TES's counterclaim for breach of the

Master Subcontract and TES's corresponding affirmative defense.

With regard to the last two allegations of breach, arriving at the BIAP facility early and

breaching the duty of loyalty, TES admitted at oral argument that those contractual obligations

are based on the LOI, not the Master Subcontract.  TES's claim fails, therefore, because TES did

not plead the LOI as a basis for its counterclaim.

TES made a motion at oral argument to amend its complaint to allege breach of the LOI.

That motion should be denied because TES is raising this theory of liability for the first time at

Page 12 - FINDINGS AND RECOMMENDATION

summary judgment, almost two years since this case was filed.  See Coleman v. Quaker Oats

Co., 232 F.3d 1271, 1294 (9th Cir. 2000) ("Because [plaintiffs] raised the disparate impact theory

of liability for the first time at summary judgment, the district court did not err when it did not

allow them to proceed on it.").

With regard to the remaining allegations of breach, failing to adequately document work

services and food purchases and fraudulently inflating headcounts, Morris argues that summary

judgment is appropriate because TES terminated the agreement for convenience rather than

cause and may not now claim that Morris was in breach, and TES suffered no damages as a

result of the alleged breach because inadequacy or fraud on the part of Morris in submitting

headcounts would have removed TES's obligation to pay Morris for those services.  The court

finds that Morris has failed to support its arguments with sufficient evidence to meets its burden

of showing that it is entitled to judgment as a matter of law on these two allegations of breach.

Morris's motion for summary judgment on this counterclaim should therefore be denied.

III.     Morris's alleged Intentional Interference with Contract

TES alleges as a counterclaim and affirmative defense for setoff that Morris intentionally

interfered in the existing contractual relationship and the potential economic relationship

between TES and KBR.  Both parties move for summary judgment on TES's counterclaim and

affirmative defense.

The parties disagree on the law that should be applied to this claim: Morris argues that

Utah law should govern; TES argues that Texas law should govern.  The court need not decide

the choice of law issue, however, because under both Utah and Texas law a plaintiff must prove

causation in order to prevail on Intentional Interference with Contract.[5]  And here, the court finds

that there is a genuine issue of material fact on causation.

TES argues that Morris engaged in a campaign of disparagement in an attempt to

interfere with TES's contract at BIAP.  The alleged acts upon which TES relies occurred in late

August through October of 2003.  In February of 2004, however, KBR renewed its contract with

TES at BIAP.  TES then continued to work under KBR at BIAP until BIAP was closed in the

summer of 2004.  Based on the record, the court finds that TES has failed to prove that it is

entitled to judgment as a matter of law on this claim.  Further, the court finds that based on this

record a reasonable juror could find for either Morris or TES on this claim.  Accordingly,

summary judgment is not appropriate.

IV.     Morris's alleged Negligence

TES alleges as a counterclaim and affirmative defense that Morris was negligent in

arriving at the BIAP facility early.  As a result of Morris's negligence, TES claims it had to

terminate SelRico for convenience rather than for cause and incur damages in excess of $2.8

million.  Morris moves for summary judgment on TES's counterclaim and affirmative defense.

The parties agree that TES's negligence claim is governed by Utah law.  Utah has

adopted the economic loss rule, which states that "a party suffering only economic loss from the

breach of an express or implied contractual duty may not assert a tort claim for such breach

---

[5]Under Utah law, a plaintiff must prove "(1) that the defendant intentionally interfered
with the plaintiff's existing or potential economic relations (2) for an improper purpose or by
improper means, (3) causing injury to the plaintiff."  St. Benedict's Development Co. v. St.
Benedict's Hosp., 811 P.2d 194, 200 (Utah 1991) (citation omitted).  Under Texas law, a plaintiff
must prove (1) there was a contract subject to interference, (2) the act of interference was willful
and intentional, (3) such intentional act was a proximate cause of plaintiff's damage, and (4)
actual damage or loss occurred.  Juliette Fowler Homes, Inc. v. Welch Associates, Inc., 793
S.W.2d 660, 664 (Tex. 1990).

Page 14 - FINDINGS AND RECOMMENDATION

absent an independent duty of care under tort law."  Hermansen v. Tasulis, 48 P.3d 235, 240

(Utah 2002) (adopting interpretation of the economic loss rule set forth by the Supreme Court of

Colorado).

In its brief, TES failed to identify an independent tort duty.  In fact, TES says in its

Opposition, "[W]here the defendant *has a contractual duty of care as did Morris*...." and "[a]s

shown above, the SelRico termination for convenience rather than default was the necessary

result of Morris's early arrival, which, *in violation of the LOI*, announced by means of a bus full

of its employees arriving that it was replacing SelRico."  (Defendant's Opposition to Plaintiff's

Motion for Partial Summary Judgment at p. 11 (emphasis added).)   At oral argument, counsel

for TES argued that the independent duty of care is the duty running from a subcontractor to the

contractor to perform the contract in good faith.  But that duty does not exist independent of the

contractual obligations between the parties, and cannot take TES's claim outside of the economic

loss rule.

Because TES's negligence claim seeks to recover only economic losses and is not based

on an independent tort duty, TES's claim is barred by the economic loss rule and Morris should

be entitled to summary judgment on TES's Second Counterclaim and corresponding affirmative

defense.

V.      TES's Motion to Strike

TES has moved to strike the following testimony set forth in paragraph ten of the

McVicker Declaration: "Morris's financier did a [credit] check on TES and the results were

unfavorable."  The evidence is arguably relevant to the issue of whether Morris used improper

means to interfere with TES's contract with KBR.  Because the court has determined that the

intentional interference with contract claims raises genuine issues of material fact that should be

Page 15 - FINDINGS AND RECOMMENDATION

decided by a jury, the motion to strike is moot at this time.

CONCLUSION

For the reasons set forth above, TES's Motion for Partial Summary Judgment (No. 42) should be granted on TES's affirmative defense of setoff for $401,737, for undisputed amounts due from Morris, and denied on all other counts.

In addition, for the reasons set forth above, Morris's Motion for Summary Judgment (No. 47) should be granted in part and denied in part as follows: (1) Morris should be granted summary judgment on its claim that TES breached the Termination Agreement by failing to pay Morris for food and equipment inventory; (2) Morris should be granted summary judgment on TES's affirmative defense of setoff for amounts representing inventory used by not purchased by Morris; (3) Morris should be denied summary judgment on TES's counterclaim for restitution and affirmative defense of setoff for amounts withheld by KBR; (4) Morris should be granted summary judgment on TES's affirmative defense of setoff for the amount paid in accrued vacation to former Morris employees; (5) Morris should be granted summary judgment on TES's counterclaim that Morris breached the Master Subcontract by arriving at the BIAP facility too early and by breaching the duty of loyalty, but denied summary judgment on TES's remaining allegations that Morris breached the Master Subcontract; (6) Morris should be denied summary judgment on TES's counterclaim for intentional interference with contract; and (7) Morris should be granted summary judgment on TES's counterclaim for negligence.

/ / / /

/ / / /

Page 16 - FINDINGS AND RECOMMENDATION

Finally, for the reasons set forth above, TES's Motion to Strike paragraph ten of the

McVicker Declaration (No. 71) should be denied as moot.

SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District

Judge for review.  Objections, if any, are due June 9, 2006.  If no objections are filed, review of

the Findings and Recommendation will go under advisement on that date.  If objections are filed,

a response to the objections is due fourteen days after the date the objections are filed and the

review of the Findings and Recommendation will go under advisement on that date.

IT IS SO ORDERED.


Dated this 25th day of May, 2006.


 /s/ Paul Papak
Honorable Paul Papak
United States Magistrate Judge

Page 17 - FINDINGS AND RECOMMENDATION